UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TED ADDISON                                                CIVIL ACTION

VERSUS                                                     NO. 13-5264

CASEY McVEA ET AL.                                         SECTION "R" (2)

## REPORT AND RECOMMENDATION

Plaintiff Ted Addison is a convicted prisoner who filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983. He asserts a single claim that defendants Dr. Casey McVea, Nurse Bessie Carter, Warden Robert Tanner, Keith Bickham and Louisiana Department of Corrections ("DOC") Secretary James LeBlanc provided him with constitutionally inadequate medical care while incarcerated in the B.B. (Sixty) Rayburn Correctional Center ("Rayburn") in Angie, Louisiana; specifically, by failing promptly to give him recommended back surgery. Addison seeks injunctive relief and monetary damages.

On September 12, 2013, I conducted a telephone conference in this matter. Participating were plaintiff pro se and Louisiana Assistant Attorneys General Phyllis Glazer and Michael Keller, representing defendants. Plaintiff was sworn and testified for all purposes contemplated by Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny.

I.    <u>THE RECORD</u>

During the <u>Spears</u> hearing, Addison testified that he is currently incarcerated in Rayburn based upon a conviction in 2000 for armed robbery for which he is currently serving a 20-year prison sentence. He estimated that his release date will be in 2016.

Addison confirmed that he asserts a single claim in this case that he did not receive adequate medical care while incarcerated in Rayburn for his lumbar degenerative disc condition that required surgery. He stated that his back condition was first diagnosed while he was incarcerated in the Elayn Hunt Correctional Center ("Hunt") before his transfer to Rayburn.  He testified that while at Hunt, jail officials sent him to a hospital where an MRI was conducted.  His written submissions state that while at Hunt, <u>before</u> his transfer to Rayburn, "plaintiff was receiving proper medical care."  Record Doc. No. 14 at p. 2.

Addison testified that his back problems initially arose at Hunt in November 2011, when he heard a pop in his back while lifting weights.  He confirmed the indication in his medical records that the weight-lifting incident occurred on or about November 17, 2011, when he was taken to the Earl K. Long Hospital after the incident.  He also confirmed that he had received and reviewed the medical records I ordered defendants to produce, Record Doc. Nos. 5 and 24, but stated that some pages were missing from some records; specifically, from a lumbar MRI and thoracic spine report dated February

9, 2013.  Addison said the medical records establish that he suffers from multiple disc bulges.  His Hunt medical records corroborate this testimony.  Specifically, two Earl K. Long Medical Center Radiology Reports dated December 1, 2011, one concerning a MRI of the lumbar spine and the other concerning a MRI of the thoracic spine, noted degenerative disc bulges at L1-2, L2-3, and L3-4, with associated nerve compression and L4 nerve root impingement.  Record Doc. No. 24.

Addison also stated, however, that a Rayburn "doctors call" form dated March 13, 2013, when he discussed the results of his earlier MRI with a physician, inaccurately reports that he had "no new complaints" on that date.  He alleged, instead, that he was ejected from that meeting with defendant Dr. Casey McVea and "pretty much banned" from further medical consultation after arguing with Dr. McVea, who summoned security to take Addison from the meeting.

Addison alleged that medical personnel, including defendants Dr. McVea and Nurse Carter, "weren't being forthcoming" with him about the extent of his disc problems. "This is normally how they deal with people like me – people that raise questions . . . because of this procedure, this system they have in place now. . . . It's not a mis-diagnosis . . . they're denying us the medical treatment based upon financial concerns, and they're being outright about it.  They're telling us 'we can't afford it.'"

Addison explained that he was transferred from Hunt – where he had no complaints about his medical treatment because Hunt officials had "quickly sent me out for MRI and set it for surgery" – to Rayburn on or about May 23, 2012, when the "treatment board system" at Rayburn was first described to him by Dr. McVea.  Addison stated that  Dr. McVea explained that there was then a "financial crisis" at Rayburn and that "everybody didn't get medical treatment" there.  He testified that Dr. McVea described the system as an evaluation "based upon the degree of the problem that you're suffering and the amount of time remaining on your sentence" that would determine whether the inmate received particular medical treatment.  Addison stated that Dr. McVea told him that "if the procedure was expensive, such as the surgical procedure that I would need," and because "I'm short, meaning that I don't have a significant amount of time remaining on my sentence, that the institution wasn't willing to pay for this." Addison alleged that "the criteria [for providing treatment] is so vague they [Rayburn medical personnel] can just apply it as they like."

In his written submissions, Addison alleged that the result of defendants' policy was that "[t]he plaintiff was victimized by the named defendants via an illegal cost cutting scheme being actively employed by the named defendants, designed to cut the costs being incurred for providing health care for the prisoners of the institution at issue . . . . [and] extreme pain being needlessly inflicted upon the person of the plaintiff."

-4-

Record Doc. No. 14 at p. 2.  He alleged that "plaintiff's situation is not a singularity, and the refusal to provide the necessary medical treatment. . . . , is in large part the result of a standard practice."  Id. at p. 3.

Addison testified that just before he was transferred from Hunt to Rayburn, he had been provided with prescription medication, including an anti-inflammatory and another drug to control his pain until the surgery was performed.  He stated that upon arriving at Rayburn, Dr. McVea told him that "these things were off the table" until funding could be received, and that instead Addison's situation would have to be presented to a "treatment board" that would determine what priority to assign to his prescribed medications and recommended surgery.  Addison's testimony concerning the discontinuation of his prescribed medications from Hunt to Rayburn is corroborated by the Rayburn "New Intake Physical Exam" form dated March 5, 2012 and signed March 6, 2012, which is contained in the verified medical records, Record Doc. No. 24, and which states in part:  "discontinue flexeril, Keppra, indocin" (emphasis added).

Addison said Dr. McVea would not tell him who was on the "treatment board" and explained that Addison would not actually appear before the board.  Addison testified that Dr. McVea said the treatment board would first have to approve funding for the medications and any other treatment he might receive. "Since then," Addison said, "I've received absolutely 100 percent nothing, . . . and the only time I've been able to get them

to do anything for me was when . . . I couldn't stand up any longer" as he attempted one day to get to the Rayburn infirmary.  He said that even then, jail officials, including Dr. McVea, were threatening simply to "lock me up," until a Rayburn nurse named Laura Buckley reviewed Addison's file, showed sympathy and gave him an injection for his back pain.  Addison's testimony concerning this injection is corroborated by a Rayburn medical record dated September 6, 2012, entitled "Health Care Request Form," indicating that Nurse Buckley gave him a toradol injection for his back pain on that date, upon the verbal order of Dr. McVea.

Addison testified that the surgery recommendation he had received was for a micro-discectomy in his lumbar spine at L3-4, as reflected in his medical records and initially scheduled to be performed in July 2012.  His testimony in this regard is corroborated by three pages contained in his medical records, two pages of which are "Rayburn . . . Emergency Room" forms with handwritten notes of medical personnel dated July 2 and 3, 2012, and a third page on a form entitled "Transmission Report" from the LSU Hospital Ambulatory Clinic also dated July 2, 2012.  These medical records note in pertinent part that on July 2, 2012, Addison "returned from University Hospital's neurosurgery clinic in stable condition" with the consulting physician's "recommended treatment" including pre-surgical administrative preparation and lab testing on July 12, 2012, and transportation "to OR [operating room] for . . . microdiscectomy @ L3-4 on

7/20/12," all noted by Rayburn registered nurse B. Cooper on July 3, 2012, with the following additional notation: "per Diane Angelico, request for surgery was faxed to surgical review committee on 07-25-2012.  No decision has been noted . . . Wendy Rasmussen is checking on this procedure."  Record Doc. No. 24.  Addison said that his untreated degenerative disc condition has inhibited his ability to use his arms and that he was "in a lot of pain."  He asserted that "as a prisoner, I have a right" to receive medical care, and defendants are preventing it for financial reasons pursuant to their evaluation procedure.

Addison testified that receiving his recommended surgery would not be a sufficient resolution of his case because "I still feel that I should be compensated for having to go through this. . . ."  He alleged that he has to take ibuprofen and naprosyn from people willing to give it to him, and that it is hard for him to reach down and otherwise work or move around because of his back condition.

During the conference, defense counsel attempted to explain the system in place at Rayburn as a result of state medical care "privatization," which counsel said commenced on July 1, 2013.  Defense counsel stated that Addison was at that time scheduled to be seen shortly by a neurosurgeon during the week of October 7, 2013, so that a determination could be made about the medical necessity of Addison's proposed surgery and a state DOC board could then determine whether to authorize payment for

it.  Although defense counsel's explanation was <u>not</u> testimony, Addison disputed it and said, "That is not what is happening here . . . at all. . . . What they say on paper and what they're doing in actual practice [are] two different things in its entirety. . . . In the meantime, I am suffering."

In light of defense counsel's advice concerning Addison's upcoming consultation with a neurosurgeon, I ordered defense counsel to provide me with the examining physician's written report and findings as soon as possible.  Record Doc. No. 23. Thereafter, I received two reports from defense counsel with attached additional medical records.  The first report advised that the examining physician on October 7, 2013, recommended surgery again, that the surgery had been scheduled, and that the DOC would pay for the surgery.  Record Doc. Nos. 29-32.  The second report advised that Addison's surgery had in fact been performed on November 20, 2013, and that upon his return to Rayburn from the hospital, Addison was placed in the prison infirmary and then returned to the general prison population housing within ten days.  Record Doc. Nos. 33-34.

II.   ANALYSIS OF PLAINTIFF'S COMPLAINT

(A)   SPEARS SCREENING STANDARDS

A prisoner's pro se complaint for alleged civil rights violations must be screened by the court as soon as practicable after docketing, regardless whether it has also been

filed in forma pauperis.  28 U.S.C. § 1915A(a); Martin v. Scott, 156 F.3d 578, 579-80 (5th Cir. 1998).  Such complaints by prisoners must be dismissed upon review if they are frivolous or fail to state a claim.  28 U.S.C. § 1915A(b)(1).

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'"  Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended).  A complaint is frivolous "if it lacks an arguable basis in law or fact."  Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).  The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'"  Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

The purpose of a Spears hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims.  Spears, 766 F.2d at 180.  "[T]he Spears procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners."  Davis, 157 F.3d at 1005. The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite

-9-

statement under Fed. R. Civ. P. 12(e).  Wilson v. Barrientos, 926 F.2d 480, 481 (5th Cir. 1991); Adams v. Hansen, 906 F.2d 192, 194 (5th Cir. 1990).  "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists."  Spears, 766 F.2d at 182.

The court may make only limited credibility determinations in a Spears hearing, Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997) (citing Cay v. Estelle, 789 F.2d 318, 326-27 (5th Cir. 1986), overruled on other grounds by Denton v. Hernandez, 504 U.S. 25 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable.  "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents.  A defendant may not use medical records to refute a plaintiff's testimony at a Spears hearing."  Id. (citing Wilson, 926 F.2d at 482-83; Williams v. Luna, 909 F.2d 121, 124 (5th Cir. 1990)).  However, "'[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.'"  Gobert v. Caldwell, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995)) (internal citations omitted).

After a Spears hearing, the complaint may be dismissed as legally frivolous only if it lacks an arguable basis in law, Jackson v. Vannoy, 49 F.3d 175, 176-77 (5th Cir. 1995); Moore v. Mabus, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous

only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible." Id. at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'" Davis, 157 F.3d at 1005 (quoting McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997)).  "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not." Moore, 976 F.2d at 269.  A prisoner's in forma pauperis complaint which fails to state a claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

In this case, I cannot conclude that plaintiff's complaint should be dismissed under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1), either as legally frivolous because it lacks an arguable basis in law or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims and defendants' alleged policy based on factors other than medical judgment.  However, because in my view Addison's case presents a close question, I am issuing this report and individualized recommendation for consideration by the presiding district judge, before going forward with further proceedings.

(B)    MEDICAL CARE

To determine whether the conduct about which Addison complains rises to the level of a violation of clearly established constitutional rights actionable under Section 1983, the appropriate standard applicable to a prisoner's medical care must be applied. Addison testified that he was a convicted prisoner at all times during which defendants allegedly failed to provide him with adequate medical care. In Estelle v. Gamble, 429 U.S. 97, 104 (1976), the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors.  Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment.  Id. at 105-06; accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976).  "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it."  Farmer v. Brennan, 511 U.S. 825,  847 (1994).

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment.  "First, the deprivation alleged must be, objectively,

'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." Id. at 834 (quotation omitted).

Further, the plaintiff must establish that the defendant possessed a culpable state of mind. Id. (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. "Mere negligence or a failure to act reasonably is not enough. The officer must have the subjective intent to cause harm." Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir. 2003). If the court finds that one of the components of the test is not met, it need not address the other component. Davis, 157 F.3d at 1005.

> The Supreme Court has recently reaffirmed that "deliberate indifference"
> is a stringent standard of fault, requiring proof that a municipal actor
> disregarded a known or obvious consequence of his action. Board of the
> County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S.
> 397, 117 S. Ct. 1382, 1391 (1997). The deliberate indifference standard
> permits courts to separate omissions that "amount to an intentional choice"
> from those that are merely "unintentionally negligent oversight[s]."

Southard v. Texas Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (additional citations omitted) (emphasis added). "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference." Norton, 122 F.3d at 291.

> [T]he decision whether to provide additional treatment is a classic example
> of a matter for medical judgment. A showing of deliberate indifference

> requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, <u>intentionally</u> treated him incorrectly, or engaged in any similar conduct that would <u>clearly</u> <u>evince</u> <u>a</u> <u>wanton</u> <u>disregard</u> <u>for</u> <u>any</u> <u>serious</u> <u>medical</u> <u>needs</u>. Deliberate indifference is an extremely high standard to meet.

<u>Gobert</u>, 463 F.3d at 346 (footnotes, citations and internal quotations omitted) (emphasis added).

Thus, when decisions made by treating medical providers concerning what care should be provided are made in the exercise of "<u>medical</u> judgment," no finding of deliberate indifference in the constitutional sense can be made.

Similarly, mere delay in receiving or negligence in providing medical care is not in and of itself a constitutional violation. <u>Easter v. Powell</u>, 467 F.3d 459, 463 (5th Cir. 2006); <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 195 (5th Cir. 1993); <u>Wesson v. Oglesby</u>, 910 F.2d 278, 284 (5th Cir. 1990). Regardless of the length of delay, plaintiff at a minimum must show deliberate indifference to serious medical needs. <u>Wilson</u>, 501 U.S. at 298. "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not." <u>Stewart v. Murphy</u>, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious medical condition that ultimately resulted in death does <u>not</u> constitute deliberate indifference, even if treatment was negligently administered); <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 193 (5th Cir. 1993) (prisoner's disagreement with the type or timing of medical

services provided cannot support a Section 1983 claim); <u>Varnado v. Lynaugh</u>, 920 F.2d 320, 321 (5th Cir. 1991) (plaintiff, who was 18 months post-surgical implantation of hip prosthesis, who complained of pain in his hip and who was ultimately diagnosed with broken wires in the prosthesis, failed to state a claim for deliberate indifference when he was seen by medical personnel "numerous times for problems relating to his hip.").

In my view, Addison's testimony and written submissions adequately allege a serious medical need for purposes of constitutional analysis.  <u>See, e.g.</u>, <u>Rutherford v. Medical Dep't</u>, No. 02-1279, 2003 WL 22207625, at *3 (10th Cir. Sept. 24, 2003) (plaintiff had serious medical need when MRI showed nerve damage and pressure on sciatic nerves, requiring surgery at discs L3, L4, and L5); <u>Palermo v. Correctional Med. Servs. Inc.</u>, 133 F. Supp. 2d 1348, 1359 (S.D. Fla. 2001) (Moreno, J.) (plaintiff who suffered from constant, severe back pain that greatly limited his mobility and had ruptured spinal disk, for which surgery had been recommended, had serious medical need); <u>Weeks v. Chaboudy</u>, 984 F.2d 185, 187 (6th Cir. 1993) (plaintiff who was paralyzed below waist and required wheelchair to move had serious medical need).  <u>But see</u> <u>Lusk v. Dallas County Sheriff's Dep't</u>, No. 3:00-CV-0662L, 2002 WL 31757706, at *4 (N.D. Tex. Nov. 29, 2002) (herniated disc and degenerative spinal disease not serious medical needs).

However, the decisions of various courts in cases presenting factual circumstances concerning surgery decisions generally are highly fact specific and result in differing decisions when it comes to assessing deliberate indifference. On one hand, even assuming for present screening purposes that Addison's testimony and written allegations are true, it cannot be concluded that defendants <u>ignored</u> plaintiff's condition after he arrived at Rayburn from Hunt.  The medical records establish that he was seen by nurses and doctors at Rayburn; that he was provided with a back brace; that his work status was reduced to light duty at one point with other restrictions on his physical activities; that he was provided with some medication, including one toradol injection  and ibuprofen – though not the same prescription medications he had been given at Hunt; and that he received an MRI.  On the other hand, I cannot determine on the current record that the delay that plaintiff experienced in his medical care at Rayburn, resulting in serious prolonged pain and ambulatory difficulties, constituted <u>mere</u> – as opposed to deliberately indifferent – delay, or that the delay was the result of appropriate <u>medical</u> –  as opposed to <u>financial</u> – judgment.

On one hand, some courts have found surgery delays longer than the delay experienced by Addison "mere delay" that is not actionable under Section 1983.  <u>See</u> <u>Varnado v. Lynaugh</u>, 920 F.2d 320, 321 (5th Cir. 1991) (plaintiff, who was 18 months post-surgical implantation of hip prosthesis, who complained of pain in his hip and who

was ultimately diagnosed with broken wires in the prosthesis, failed to state a claim for deliberate indifference when he was seen by medical personnel "numerous times for problems relating to his hip."); Samonte v. Bauman, 264 Fed. Appx. 634, 2008 WL 176462, at *1 (9th Cir. 2008) (Plaintiff who waited for cataract surgery for more than two years after his initial complaint, but who routinely saw doctors to monitor his condition during that time, could not establish deliberate indifference.); McBarron v. Federal Bureau of Prisons, 332 Fed. Appx 961, 964, 2009 WL 1659221, *1 (5th Cir. 2009) (Fifth Circuit affirmed the district court's dismissal of the prisoner's medical care claim where plaintiff "was not ignored, . . . he was given pain medication, and . . . surgery was approved once it became medically necessary.  No showing of deliberate indifference is made."); Williams v. Wright, 162 Fed. Appx. 69, 2006 WL 93096 (2nd Cir. 2006) (Second Circuit affirmed the district court's summary judgment ruling dismissing a prisoner's case alleging wrongful denial of hip replacement surgery, stating that "[t]he essential test is one of medical necessity and not one simply of desirability," id. at 71, even if the prisoner had "suffered real pain from his degenerative hip condition," where he had also been "routinely seen by doctors . . . , generally with a view toward surgery" and provided with "various medications, a back brace and several prison accommodations to minimize the distress of his condition."  Id. at 72, *2.).

On the other hand, some courts have found that a combination of factors, including severe pain and substantial delay in providing recommended surgery for reasons other than medical judgment may constitute deliberate indifference to serious medical need. See Walker v. Brooks, 2009 WL 3183051 (W.D. Pa. Sept. 30, 2009) (orthopedist recommended total hip replacement for a prisoner, but surgery was delayed more than a year, because plaintiff was then housed in a jail unit where post-operative care and physical therapy could not be accommodated, causing prisoner to suffer significant, persistent pain).

In this case, Addison has alleged deliberate termination of prescribed medications and delay in providing recommended surgery, and that the delay occurred not because of lack of medical necessity but based upon a formal policy or practice that evaluated financial concerns and the longevity of an inmate's remaining sentence. Addison alleges that the delay, coupled with the seriousness of his condition, resulted in severe pain and ambulatory degeneration. Under these circumstances, I find that Addison states a claim of violation of his constitutional rights that is not legally frivolous and should be subjected to further proceedings.

Of course, a finding that Addison's complaint states a claim as a screening matter does not deprive defendants of the defense of qualified immunity. Qualified immunity shields government officials from liability for performing discretionary functions. This

-18-

defense, if applicable, protects defendants not only from liability, but also from suit, including discovery and other burdensome pretrial proceedings.  Vander Zee v. Reno, 73 F.3d 1365, 1368-69 (5th Cir. 1996) (citing Mitchell v. Forsyth, 472 U.S. 511, 525-26 (1985)); Schultea v. Wood, 47 F.3d 1427, 1436 (5th Cir. 1995) (en banc). To give full effect to the potent protection of government officials provided by this doctrine, early determination of the qualified immunity issue before extensive discovery and trial should be the preferred procedure.

A qualified immunity defense is analyzed under a two-step process.  Jacobs v. West Feliciana Sheriff's Dep't, 228 F.3d 388, 393 (5th Cir. 2000); Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998); Colston v. Barnhart, 130 F.3d 96, 99 (5th Cir. 1997).  The first step is to determine whether plaintiff has alleged a violation of a clearly established constitutional right.  Jacobs, 228 F.3d at 393;  Hare, 135 F.3d at 325; Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  This report recommends that Addison has done so in this case.  However, even if plaintiff has alleged a constitutional violation, the second step of qualified immunity evaluation  requires the court to determine whether defendant's conduct was objectively reasonable under existing clearly established law. Glenn v. City of Tyler, 242 F.3d 307, 312 (5th Cir. 2001); Jacobs, 228 F.3d at 393; Foster v. City of Lake Jackson, 28 F.3d 425, 429 (5th Cir. 1994). Officials who act reasonably

but mistakenly are still entitled to the defense. Qualified immunity gives ample room for mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law. Anderson v. Creighton, 483 U.S. 635, 641 (1987); Malley v. Briggs, 475 U.S. 335, 341, 343 (1986); Hare, 135 F.3d at 325.

In this case, that evaluation must be based upon whatever uncontroverted evidence defendants might submit establishing the objective reasonableness of the "privatization" evaluation process briefly described by defense counsel during the Spears hearing in this case. Thus, the case is not ripe for determination of the qualified immunity defense as a screening matter.

## **RECOMMENDATION**

For all of the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's complaint should not be dismissed as a screening matter under 28 U.S.C. § 1915A, and that further proceedings should be scheduled, including early determination of any motion for summary judgment based upon the qualified immunity defense that defendants should be required to file in the renewed proceedings.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and

legal conclusions accepted by the district court, provided that the party has been served

with notice that such consequences will result from a failure to object.  Douglass v.

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28

U.S.C. § 636(b)(1)).[1]

New Orleans, Louisiana, this ___14th___ day of April, 2014.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[2] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.