UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TED ADDISON                                          CIVIL ACTION

VERSUS                                              NO. 13-5264

CASEY MCVEA ET AL.                                  SECTION "R" (2)

## REPORT AND RECOMMENDATION

Plaintiff Ted Addison is a convicted prisoner who filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983.  He asserts a single claim that defendants Dr. Casey McVea, Nurse Bessie Carter, Warden Robert Tanner, Deputy Warden Keith Bickham and Louisiana Department of Corrections ("DOC") Secretary James LeBlanc provided him with constitutionally inadequate medical care during his incarceration in the B.B. "Sixty" Rayburn Correctional Center ("Rayburn") in Angie, Louisiana; specifically, by failing promptly to give him recommended back surgery.  Addison seeks injunctive relief and monetary damages.  Complaint, Record Doc. No. 1; Amended Complaint, Record Doc. No. 28.  His request for injunctive relief to provide him with back surgery was dismissed as moot after he received the surgery.  Record Doc. No. 36.  However, he also seeks prospective injunctive relief based on allegations that he has not received post-operative physical therapy at Rayburn and that defendant Dr. McVea has refused to authorize any further treatment, even though plaintiff has been diagnosed with damage to his thoracic spine and nerve damage.

I ordered defendants to file a motion for summary judgment to address qualified immunity, Record Doc. No. 50, and they filed a timely motion. Record Doc. No. 61. The United States Court of Appeals for the Fifth Circuit has described qualified immunity as "immunity from suit," including "protection from pretrial discovery," and not just "a mere defense to liability." Backe v. LeBlanc, 691 F.3d 645, 648 (5th Cir. 2012). "Because [this] immunity is 'effectively lost if a case is erroneously permitted to go to trial,'" qualified immunity has been deemed to be "an important issue" of such magnitude that "a denial of qualified immunity may be immediately appealed." Id. (quoting Mitchell v. Forsyth, 472 U.S. 511, 526-27 (1985)).

Defendants' motion is supported by several sworn affidavits and a verified, Bates-numbered copy of plaintiff's medical records from Rayburn. Defendant's Exh. 2, Record Doc. No. 61-4 (manual attachment). Defendants argue that they are entitled to qualified immunity in their individual capacities in that (a) no violation of constitutional rights occurred because the medical provider defendants, Dr. McVea and Nurse Carter, were not deliberately indifferent to plaintiff's serious medical needs and they have provided him with extensive treatment and medical attention for his condition, including, after this lawsuit was filed, the back surgery that he seeks in his complaint; and (b) defendants Tanner, Bickham and LeBlanc had no personal involvement in providing Addison's medical care. Defendants also contend that plaintiff's claims for prospective injunctive

relief against them in their official capacities should be dismissed based on sovereign immunity.

Plaintiff filed a written opposition to defendants' motion.  I have considered his opposition memorandum,[1] together with his other written submissions in support of his claim; his verified medical records, Record Doc. Nos. 24, 29, 30, 34 and 70, and Defendant's Exh. 2, Record Doc. No. 61-4; and his sworn testimony provided pursuant to <u>Spears v. McCotter</u>, 766 F.2d 179 (5th Cir. 1985), and its progeny, on September 12, 2013, Record Doc. No. 23, in opposition to defendants' motion.

Having considered the motion, the record as a whole and the applicable law, I recommend that defendants' motion should be GRANTED and this cased DISMISSED WITH PREJUDICE for the following reasons.

I.    <u>FACTUAL BACKGROUND</u>

During the <u>Spears</u> hearing, Addison testified that he is currently incarcerated in Rayburn based upon a conviction in 2000 for armed robbery, for which he is serving a 20-year prison sentence.  He estimated that his release date will be in 2016.

Addison confirmed that he asserts a single claim that, while incarcerated in Rayburn, he did not receive adequate medical care for his lumbar degenerative disc

---

[1]The court must "liberally construe briefs of <u>pro se</u> litigants and apply less stringent standards to parties proceeding <u>pro se</u> than to parties represented by counsel," <u>Smith v. Lonestar Constr., Inc.</u>, 452 F. App'x 475, 476 (5th Cir. 2011) (quotation omitted); <u>Moore v. McDonald</u>, 30 F.3d 616, 620 (5th Cir. 1994), and I have done so in this case.

condition, which required surgery.  He stated that his back condition was first diagnosed while he was incarcerated in the Elayn Hunt Correctional Center ("Hunt") before his transfer to Rayburn.  He testified that jail officials at Hunt sent him to a hospital where an MRI (Magnetic Resonance Imaging) was conducted.  His written submissions state that, while at Hunt and underline before his transfer to Rayburn, he "was receiving proper medical care."  Record Doc. No. 14 at p. 2.

Addison testified that his back problems initially arose at Hunt in November 2011, when he heard a pop in his back while lifting weights.  He confirmed the indication in his medical records that the weight-lifting incident occurred on or about November 17, 2011, when he was taken to Earl K. Long Hospital after the incident.  He also confirmed that he had received and reviewed the medical records I ordered defendants to produce, Record Doc. Nos. 5 and 24, but stated that some pages were missing from some records; specifically, a lumbar MRI and thoracic spine report dated February 9, 2013.

Addison said that the medical records establish that he suffers from multiple disc bulges.  His Hunt medical records corroborate this testimony.  Specifically, an MRI of his thoracic spine at Earl K. Long Medical Center on December 1, 2011, indicated a broad-based focal left-sided T9 disc bulge or protrusion without any significant central canal stenosis[2] and a mild broad-based T11-T12 disc bulge, with "no significant thoracic

---

[2]Spinal stenosis is "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space."  Dorland's Illustrated Medical Dictionary 1698 (29th ed. 2000).

-4-

cord abnormality."  Bates-stamped medical records, Defendant's Exh. 2, Record Doc. No. 61-4 at p. 0429.  An MRI of his lumbar spine the same date noted degenerative disc bulges at L1-2, L2-3 and L3-4, with associated nerve compression and L4 nerve root impingement.  Id. at pp. 0427-29.

Addison also stated, however, that a Rayburn "doctors call" form dated March 13, 2013, when he discussed the results of his earlier MRI with a physician, inaccurately reports that he had "no new complaints" on that date.  He alleged, instead, that he was ejected from that meeting with defendant Dr. McVea and "pretty much banned" from further medical consultation after arguing with Dr. McVea, who summoned security to take Addison from the meeting.

Addison alleged that medical personnel, including defendants Dr. McVea and Nurse Carter, "weren't being forthcoming" with him about the extent of his disc problems. "This is normally how they deal with people like me – people that raise questions . . . because of this procedure, this system they have in place now. . . .  It's not a mis-diagnosis . . . they're denying us the medical treatment based upon financial concerns, and they're being outright about it.  They're telling us 'we can't afford it.'"

Addison explained that he was transferred from Hunt – where he had no complaints about his medical treatment because Hunt officials had "quickly sent me out for MRI and set it for surgery" – to Rayburn on or about May 23, 2012, when the "treatment board system" at Rayburn was first described to him by Dr. McVea.  Addison

stated that Dr. McVea explained that there was a "financial crisis" at Rayburn and that "everybody didn't get medical treatment" there.  He testified that Dr. McVea described the system as an evaluation "based upon the degree of the problem that you're suffering and the amount of time remaining on your sentence" that would determine whether the inmate received particular medical treatment.  Addison stated that Dr. McVea told him that, "if the procedure was expensive, such as the surgical procedure that I would need," and because "I'm short, meaning that I don't have a significant amount of time remaining on my sentence, that the institution wasn't willing to pay for this."  Addison alleged that "the criteria [for providing treatment] is [sic] so vague they [Rayburn medical personnel] can just apply it as they like."

In his written submissions, Addison alleged that the result of defendants' policy was that he "was victimized by the named defendants via an illegal cost cutting scheme being actively employed by the named defendants, designed to cut the costs being incurred for providing health care for the prisoners of the institution at issue . . . [and] extreme pain being needlessly inflicted upon the person of the plaintiff."  Record Doc. No. 14 at p. 2.  He alleged that his "situation is not a singularity, and the refusal to provide the necessary medical treatment . . . is in large part the result of a standard practice."  Id. at p. 3.

Addison testified that, just before he was transferred from Hunt to Rayburn, he had been provided with prescription medication, including an anti-inflammatory and another

drug to control his pain until the surgery was performed.  He stated that, upon arriving at Rayburn, Dr. McVea told him that "these things were off the table" until funding could be received, and that instead Addison's situation would have to be presented to a "treatment board" which would determine what priority to assign to his prescribed medications and recommended surgery.   Addison's testimony concerning the discontinuance of his prescribed medications from Hunt to Rayburn is partially corroborated by the Rayburn "New Intake Physical Exam" form dated March 5, 2012 and signed March 6, 2012, which is contained in the verified medical records and states in part, "discontinue Flexeril,[3] Indocin[4] and Keppra.[5]" Record Doc. No. 24 and Defendant's Exh. 2, Record Doc. No. 61-4 at p. 0525 (emphasis added).

Addison said that Dr. McVea would not tell him who was on the "treatment board" and that the doctor explained that plaintiff would not actually appear before the board. Addison testified that Dr. McVea said the treatment board would first have to approve funding for the medications and any other treatment he might receive.  "Since then,"

---

[3]Flexeril (generic name:  cyclobenzaprine) "is a muscle relaxant used in combination with rest and physical therapy for the relief of severe and painful conditions, such as muscle spasms due to sprains, strains, or pulls."  PDRhealth (PDR Network, LLC), http://www.pdrhealth.com/drugs/flexeril, (visited Mar. 19, 2015).

[4]Indocin (generic name:  indomethacin) is a nonsteroidal anti-inflammatory drug (NSAID) used to relieve inflammation, swelling, stiffness and joint pain associated with moderate or severe arthritis. It is also used to treat inflammation of the tendon, acute gouty arthritis and other inflammatory conditions.  Id., http://www.pdrhealth.com/drugs/indocin (visited Mar. 19, 2015).

[5]Keppra (generic name: levetiracetam) is used to treat several types of seizures in both adults and children with epilepsy.  Id., http://www.pdrhealth.com/drugs/keppra (visited Mar. 19, 2015).

Addison said, "I've received absolutely 100 percent nothing, . . . and the only time I've been able to get them to do anything for me was when . . . I couldn't stand up any longer" as he attempted one day to get to the Rayburn infirmary.  He said that even then, jail officials, including Dr. McVea, were threatening simply to "lock me up," until a Rayburn nurse named Laura Buckley reviewed Addison's file, showed sympathy and gave him an injection for his back pain.  Addison's testimony concerning this injection is corroborated in part by a Rayburn medical record dated September 6, 2012, entitled "Health Care Request Form," indicating that Nurse Buckley gave him a Toradol[6] injection for his back pain on that date, upon the verbal order of Dr. McVea.  Defendant's Exh. 2, Record Doc. No. 61-4 at p. 0501.

Addison testified that the surgery recommendation he had received was for a microdiscectomy in his lumbar spine at L3-4, as reflected in his medical records, which was initially scheduled to be performed in July 2012.  His testimony in this regard appears to be corroborated by three pages contained in his medical records, two pages of which are "Rayburn . . . Emergency Room" forms with handwritten notes of medical personnel dated July 2 and 3, 2012, and a third page on a form entitled "Transmission Report" from the LSU Hospital Neurosurgery Clinic also dated July 2, 2012.  These

---

[6]Toradol (generic name:  ketorolac) is a nonsteroidal anti-inflammatory drug (NSAID) used to relieve moderately severe pain.  Mayo Clinic (Thomson Healthcare Inc. 2015), http://www.mayoclinic.org/drugs-supplements/ketorolac-oral-route-injection-route/description/drg-20066882 (visited Mar. 19, 2015).

records note in pertinent part that Addison "returned from University Hospital's neurosurgery clinic in stable condition" on July 2, 2012, with the consulting physician's "recommended treatment" including pre-surgical administrative preparation and lab testing on July 12, 2012, and transportation "to OR [operating room] for . . . microdiscectomy @ L3-4 on 7/20/12," all noted by Rayburn registered nurse B. Cooper on July 3, 2012, with the following additional notation: "per Diane Angelico, request for surgery was faxed to surgical review committee on 07-25-2012. No decision has been noted . . . Wendy Rasmussen is checking on this procedure." Record Doc. No. 24; Defendant's Exh. 2, Record Doc. No. 61-4 at pp. 0502-03, 0505.

However, Dr. McVea explains in his affidavit that these medical records show that a neurosurgery resident recommended that back surgery be scheduled for July 20, 2012, but that the recommendation first had to be approved by Dr. McVea, which he did on July 3, 2012, and by the LSU surgery board. Because the LSU surgery board did not approve the recommendation until September 19, 2012, the procedure was never actually scheduled for July 20, 2012. Affidavit of Casey McVea, M.D., Defendant's Exh. 1, Record Doc. No. 61-3 at ¶¶ 132-35, 141-46.

Addison said that his untreated degenerative disc condition has inhibited his ability to use his arms and that he was "in a lot of pain." He asserted that "as a prisoner, I have a right" to receive medical care, and defendants are preventing it for financial reasons pursuant to their evaluation procedure.

-9-

Addison testified that receiving his recommended surgery would not be a sufficient resolution of his case because "I still feel that I should be compensated for having to go through this." He alleged that he has to take ibuprofen and Naprosyn[7] from people willing to give it to him, and that it is hard for him to reach down and otherwise work or move around because of his back condition.

In addition to the medical records addressed and confirmed by Addison in his testimony, his complete medical records and the affidavit of Dr. McVea submitted with defendants' motion for summary judgment, which is uncontradicted by any competent summary judgment underline evidence, establish that plaintiff was evaluated numerous times by prison physicians and outside consulting physicians while at Rayburn and received extensive medical care including, on November 20, 2013, the back surgery that he sought in this matter. These physicians assessed and treated his condition on multiple occasions, including conducting x-rays and an MRI of his back, prescribing medication and scheduling neurosurgical consultations and surgery.

Addison arrived at Rayburn on March 5, was transferred back to Hunt on April 24 and returned again to Rayburn on May 22, 2012. On March 5 and May 22, 2012, Dr. McVea conducted an intake screening and reviewed plaintiff's medical records, which

---

[7]Naprosyn (generic name: naproxen) is an NSAID used to relieve symptoms of arthritis or to treat mild to moderate pain caused by painful conditions such as acute gout, bursitis or tendonitis. Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/naproxen-oral-route/description/drg-20069820 (visited Mar. 19, 2015).

had been transferred from Hunt with him.  Both times, Dr. McVea ordered that Addison

be provided with a restricted duty status in the dorm, a back brace and a bottom bunk bed

as a result of his back condition.

On March 5, 2012, Dr. McVea discontinued the Flexeril, Indocin and Keppra that

had been prescribed for plaintiff at Hunt.  Dr. McVea explains in his affidavit that he

discontinued the medications at Addison's request and that he offered to give plaintiff

ibuprofen, which plaintiff declined.  Defendant's Exh. 1, Record Doc. No. 61-3 at ¶¶ 50-

53.  In his opposition memorandum, Addison asserts that these "medications were

refused me upon entry into Rayburn."  However, he admits that at that time he did not

want to become dependent on pain medication, did not want to worry about the side

effects of pain medication and only wanted surgical repair of the damaged areas.  Record

Doc. No. 73 at pp. 12-13.

The medical records indicate that plaintiff did not complain of pain at any time

after he arrived at Rayburn on March 5, 2012, and before he was transferred back to Hunt

on April 24, 2012.  He did not complain of pain and was prescribed no medications

during the month that he was back at Hunt.  He returned to Rayburn on May 22, 2012

without any prescription for pain medicine.  Defendant's Exh. 1, Record Doc. No. 61-3

at ¶¶ 55-58.  Dr. McVea prescribed a Toradol injection for Addison on September 6,

2012 and a six-month supply of Ultram[8] more than one year later on October 8, 2013. These were the only two times between plaintiff's arrival at Rayburn in March 2012 and his surgery on November 20, 2013, when he complained of pain to Rayburn medical personnel. Id. at ¶¶ 59-63.

The LSU surgery board approved the recommendation of plaintiff's neurosurgeon for back surgery on September 19, 2012. The board's approval was sent to Rayburn with a note that the hospital would contact the prison with an appointment date for the operation. No one at Rayburn had any control over when that appointment would be. Defendant's Exh. 1, Record Doc. No. 61-3 at ¶¶ 132-35, 146-48.

Between December 3, 2012 and October 7, 2013, the LSU neurosurgery clinic ordered more examinations and tests. One appointment was cancelled because the surgeon became unavailable on the scheduled date. Dr. McVea approved and requested all the examinations and tests without any changes. A repeat MRI of plaintiff's lumbar spine on February 9, 2013, Defendant's Exh. 2, Record Doc. No. 61-4 at p. 490, revealed essentially the same condition with only insignificant and non-dangerous degenerative changes and no additional disc herniation since the December 2011 MRI. Defendant's Exh. 1, Record Doc. No. 61-3 at ¶¶ 226-29. Neurosurgeon Jayme Trahan, M.D.,

---

[8]Ultram (generic name: tramadol) is an opioid analgesic used to manage moderate to moderately severe pain in adults. Id., http://www.pdrhealth.com/drugs/ultram (visited Mar. 19, 2015).

performed a lumbar laminotomy[9] on November 20, 2013 and plaintiff returned to Rayburn that same day.

After the surgery, Addison received pain medications, had follow-up appointments with Dr. McVea and health care providers at the hospital and underwent still another MRI of his lumbar spine.  On December 5, 2013, the neurosurgery clinic released him to return to light work duty as of January 1, 2014 and to full duty in three months. Addison returned to work as a baker, the same restricted duty job he had held before his surgery. Offender Movement Sheets, Defendant's Exh. 7, Record Doc. No. 61-9. During the following three months, Addison did not complain of pain to Rayburn medical personnel.  Defendant's Exh. 1, Record Doc. No. 61-3 at ¶¶ 205-24.  Dr. McVea implemented the recommendations of plaintiff's treating neurosurgeon, Frank Culicchia, M.D., on March 17, 2014, except that Addison himself requested that his prescribed Neurontin[10] be discontinued.  Dr. McVea prescribed ibuprofen instead. Defendant's Exh. 1, Record Doc. No. 61-3 at ¶¶ 216, 221; Defendant's Exh. 2, Record Doc. No. 61-4 at p. 0446.

---

[9]A laminotomy is "[e]xcision of a portion of a vertebral lamina resulting in enlargement of the intervertebral foramen for the purpose of relieving pressure in a spinal nerve root."  Stedmans Medical Dictionary on Westlaw at STEDMANS 478890.

[10]Neurontin (generic name: gabapentin) is used to help relieve certain types of nerve pain. PDRhealth, http://www.pdrhealth.com/drugs/neurontin (visited Mar. 23, 2015).

Another MRI on May 2, 2014, revealed only arthritic changes and no thoracic changes that required surgical intervention.  By May 19, 2014, plaintiff required no further neurosurgical follow-up, according to Dr. Culicchia.  Defendant's Exh. 1, Record Doc. No. 61-3 at ¶ 224; Defendant's Exh. 2, Record Doc. No. 61-4 at p. 0441.

Dr. McVea examined Addison on July 8 regarding medical conditions unrelated to his back problems and again on October 6, 2014.  Plaintiff made no sick call requests between those dates.  At the latter visit, Addison complained that "hard footwear" was causing him back pain and told Dr. McVea that he wanted to continue "conservative treatment."  Dr. McVea prescribed softer shoes.  Plaintiff has prescriptions for Motrin and Keppra for pain, but he skips more of his prescribed doses than he takes.  According to Dr. McVea, Addison has good strength, can bear his full weight on both legs and walks without assistance.  Dr. McVea determined that plaintiff has no need for further referrals at this time.  Defendant's Exh. 1, Record Doc. No. 61-3 at ¶¶ 232-44.

## II.  SUMMARY JUDGMENT

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Rule 56, as revised effective December 1, 2010, establishes new procedures for supporting factual positions:

> (1)  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> (2)  Objection That a Fact Is Not Supported by Admissible Evidence.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
> (3)  Materials Not Cited.  The court need consider only the cited materials, but it may consider other materials in the record.
> (4)  Affidavits or Declarations.  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Thus, the moving party bears the initial burden of identifying those materials in the record that it believes demonstrate the absence of a genuinely disputed material fact, but it is not required to negate elements of the nonmoving party's case.  Capitol Indem. Corp. v. United States, 452 F.3d 428, 430 (5th Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce

admissible evidence to carry its burden as to [a particular material] fact."  Advisory Committee Notes, at 261.

A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  No genuine dispute of material fact exists if a rational trier of fact could not find for the nonmoving party based on the evidence presented.  Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 712 (5th Cir. 1994).

To withstand a properly supported motion, the nonmoving party who bears the burden of proof at trial must cite to particular evidence in the record to support the essential elements of its claim.  Id. (citing Celotex, 477 U.S. at 321-23); accord U.S. ex rel. Patton v. Shaw Servs., L.L.C., 418 F. App'x 366, 371 (5th Cir. 2011).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial."  Celotex, 477 U.S. at 323; accord U.S. ex rel. Patton, 418 F. App'x at 371.

"Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."  Edwards v. Your Credit, Inc., 148 F.3d 427, 432 (5th Cir. 1998); accord Murray v. Earle, 405 F.3d 278, 284 (5th Cir. 2005).  "We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."  Badon v. R J R Nabisco Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quotation omitted)

-16-

(emphasis in original).  "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'" Nat'l Ass'n of Gov't Employees, 40 F.3d at 713 (quoting Anderson, 477 U.S. at 249).

"Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation omitted) (emphasis in original); accord Duron v. Albertson's LLC, 560 F.3d 288, 291 (5th Cir. 2009).

III.    ANALYSIS

(A)    The Arguments of the Parties

Defendants argue in their motion that Addison has received extensive treatment and accommodation for his back condition and that he cannot establish that they have subjected him to deliberate indifference under the constitutional standard.  They characterize this dispute as a disagreement about plaintiff's course of treatment and contend that the medical judgments upon which they have relied establish that he had no serious medical needs that were not being treated.  Defendants assert that the back surgery Addison sought was not delayed because of any deliberate indifference on their

part, but because of administrative delays caused by the LSU Hospital system over which they had no control, and that the delays did not harm him.  Defendants contend that plaintiff has no serious medical needs at the present time but that, even if he does, he is receiving constitutionally adequate medical care.  They argue that their conduct has been objectively reasonable and that they are entitled to dismissal of Addison's complaint against them in their individual capacities under the qualified immunity doctrine as a matter of law.  Finally, defendants contend that they are entitled, under the doctrine of sovereign immunity, to dismissal of plaintiff's claims for injunctive relief against them in their official capacities.

In his opposition memorandum, Addison argues that defendants have provided no evidence in support of their motion.  Record Doc. No. 73 at p. 2.  On the contrary, the sworn affidavits and verified medical records attached to defendants' motion are competent and admissible summary judgment evidence.  Fed. R. Civ. P. 56(c)(1), (4). Plaintiff alleges, but provides no admissible evidence, that defendants have a "'treatment board' system, and . . . related cost cutting methodology," Record Doc. No. 73 at p. 3, pursuant to which defendants acted jointly in a scheme to reduce costs; that defendants refused to provide him with medical care which they knew he required; and that they knew their refusal would cause him to suffer, "due to concerns relative to costs," id. at p. 4, which constitutes deliberate indifference to his serious medical needs.  He argues that defendants continue to refuse to treat him by not allowing him to be seen by a

specialist, even though he has neurological problems in his left leg that are worsening. Id. at pp. 13-14. Addison's additional arguments regarding inadequate medical care that was allegedly provided to other inmates are irrelevant to the instant case, which concerns only whether the medical care that he personally received was constitutionally adequate.

(B)     Qualified Immunity

Defendants' motion for summary judgment regarding plaintiff's claim for money damages requires application of two related substantive legal standards. First, the motion asserts the potent defense of qualified immunity. Specifically, defendants argue that they are entitled to qualified immunity on plaintiff's claim that they violated his constitutional rights concerning his medical care by failing to provide him with back surgery sooner and by failing to provide additional treatment that he has requested since the surgery. Defendants contend that their conduct in this regard did not violate clearly established Eighth Amendment constitutional rights and that their decisions concerning Addison's medical care have been objectively reasonable, such that the doctrine of qualified immunity compels judgment in their favor.

The Fifth Circuit has summarized the procedure and substance applicable to assertion of the qualified immunity doctrine as follows.

> The doctrine of qualified immunity offers a shield against civil liability for government employees "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." . . . . "[W]hether an official protected by qualified immunity may be held personally liable for an

allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."

In Saucier v. Katz, 533 U.S. 194 . . . (2001), the Supreme Court articulated a mandatory "two-step sequence for resolving government officials' qualified immunity claims." Saucier required that lower courts consider first, whether "the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of [constitutional or] federal law," and second, if a violation has been alleged, "whether the right was clearly established" at the time of the alleged government misconduct. In the recent case of Pearson v. Callahan, the Court reconsidered the Saucier procedure, determined that "while the [two-step] sequence . . . is often appropriate, it should no longer be regarded as mandatory," and gave lower courts "permi[ssion] to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." In conducting our initial inquiry–whether the [plaintiffs] have alleged a violation of a constitutional right–we "employ currently applicable constitutional standards."

On the second inquiry–whether the right allegedly violated is "clearly established"–"[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." "The 'clearly established' standard does not mean that officials' conduct is protected by qualified immunity unless the very action in question has previously been held unlawful." "[W]hat clearly established means . . . depends largely upon the level of generality at which the relevant legal rule is to be identified." "[A]n official does not lose qualified immunity merely because a certain right is clearly established in the abstract." Officials should receive the protection of qualified immunity "unless the law is clear in the more particularized sense that reasonable officials should be on notice that their conduct is unlawful." The court's focus, for purposes of the "clearly established" analysis, should be on "fair warning": qualified immunity is unavailable "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."

-20-

Wernecke v. Garcia, 591 F.3d 386, 392-93 (5th Cir. 2009) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009); Saucier, 533 U.S. at 201; Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Hope v. Pelzer, 536 U.S. 730, 740 (2002); Wilson v. Layne, 526 U.S. 603, 614 (1999); Anderson v. Creighton, 483 U.S. 635, 639, 640 (1987)) (internal quotations omitted) (additional citations omitted).

Second, to determine whether the conduct about which Addison complains rises to the level of a violation of clearly established constitutional rights actionable under Section 1983, the appropriate standard applicable to a prisoner's medical care must be applied. Addison testified that he was a convicted prisoner at all times during which defendants allegedly failed to provide him with adequate medical care. In Estelle v. Gamble, 429 U.S. 97, 104 (1976), the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors. Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment. Id. at 105-06; accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976). "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825,  847 (1994).

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment.  "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  Id. at 834 (quotation omitted).

Further, the plaintiff must establish that the defendant possessed a culpable state of mind.  Id. (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  "Mere negligence or a failure to act reasonably is not enough. The officer must have the subjective intent to cause harm."  Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir. 2003).  If the court finds that one of the components of the test is not met, it need not address the other component.  Davis, 157 F.3d at 1005.

> The Supreme Court has recently reaffirmed that "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.  Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 117 S. Ct. 1382, 1391 (1997).  The deliberate indifference standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

Southard v. Tex. Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (additional citations omitted) (emphasis added).  "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference."  Norton, 122 F.3d at 291.

In this case, the record negates any inference that defendants acted with deliberate indifference to a serious medical need.  As to serious medical needs, the Fifth Circuit has recently stated in similar circumstances in a case emanating from this court that when an inmate plaintiff

> required medication to manage his pain, rated his pain as a nine or ten on a ten point scale, and his condition warranted surgery, we have no difficulty holding that his degenerative hip condition constituted a serious medical need.  See Gobert, 463 F.3d at 345 n.12 ("A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required.").

Thomas v. Carter, 593 F. App'x 338, 343 (5th Cir. 2014).  In the instant case, Addison had a degenerative lumbar disc condition with associated nerve compression and nerve root impingement, which was confirmed on MRI, treated with pain medication and warranted surgery.  As defendants admit in their motion, Addison had a serious medical need before his recommended surgery.

However, plaintiff's testimony, the affidavits attached to defendants' motion and the verified medical records establish that defendants were <u>not</u> deliberately indifferent to his back condition in the constitutional sense.  Addison has alleged facts, confirmed by his testimony, his medical records and the other evidence, that negate any inference of deliberate indifference by jail officials.

Plaintiff was seen on numerous occasions by nurses and doctors concerning his back condition, including monitoring and examinations by physicians inside and <u>outside</u>

of the prison.   He was provided with x-rays, MRIs, pain and anti-inflammatory medications, a restricted work status and lumbar surgery.

Addison alleges that, since his surgery, he has thoracic nerve damage and worsening neurological damage that defendants refuse to treat.   However, according to the uncontroverted medical evidence, plaintiff has no nerve damage in his thoracic spine and he is being treated for his complaints of continued back pain.   On March 17, 2014, Dr. Culicchia prescribed Neurontin and recommended another MRI of plaintiff's lumbar spine in response to Addison's complaint of ongoing back pain.   Dr. McVea adopted Dr. Culicchia's recommendations and ordered the MRI.   However, Addison declined to take Neurontin and Dr. McVea prescribed ibuprofen instead.   Defendant's Exh. 1, Record Doc. No. 61-3 at ¶ 221; Defendant's Exh. 2, Record Doc. No. 61-4 at pp. 0446-48. Plaintiff had the MRI on May 2, 2014.   Id. at pp. 0424-25, 0442.

Dr. Culicchia reviewed the MRI results with plaintiff on May 19, 2014, and noted that Addison

> continues to complain of pain in the back following surgery.  The MR[I] of the lumbar spine was obtained and available for my review.  I concur with the radiologist report.  The patient was arguing with me about the results. I explained he must have some arthritic changes in the spine to account for his pain.  He wants [to know] the long term side effect of taking this medicine.  I told him that he could get all of that information from the medical staff.  He then told me that he had problems with his thoracic spine and wanted to know when that would be addressed.  I explained that he did not have a surgical lesion in the thoracic spine.  I ended the meeting as we were getting no where [sic] with conversation.  There is no need for neurosurgical follow up.

Id. at p. 0441 (emphasis added).  Considering these uncontroverted medical findings, there is no evidence that plaintiff has an injury to his thoracic spine requiring neurosurgical treatment.   He is receiving treatment by Dr. McVea to address his complaints of pain, including regular examinations, medications and softer shoes.  The record indicates that plaintiff chooses to skip many of his prescribed medication doses and has not sought any stronger pain medicine.  Dr. McVea noted that Addison has good strength, can bear his full weight on both legs and walks without assistance.  Dr. McVea determined that plaintiff has no need for any further referrals at this time.  Accordingly, Addison has not shown that he has any serious medical need since his surgery.  See Lusk v. Dallas Cnty. Sheriff's Dep't, No. 3:00-CV-0662L, 2002 WL 31757706, at *4 (N.D. Tex. Nov. 29, 2002) (herniated disc and degenerative spinal disease not serious medical needs); Nelson v. Rodas, No. 01CIV7887RCCAJP, 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002) (back spasms and pain not a serious medical need); Solomon v. Moore, No. 97 Civ. 0201(KTD), 2000 WL 385521, at *2-3 (S.D.N.Y. Apr. 14, 2000) (when plaintiff was able to walk and function normally despite neck, back and groin pains, he had no serious medical needs).

In addition, it cannot be inferred from the competent summary judgment evidence that defendants ignored plaintiff's complaints, intentionally treated him incorrectly or were otherwise deliberately indifferent to his condition.  While it is clear from his

allegations and testimony that Addison is not satisfied with the nature of his medical care, no finding of deliberate indifference can be made based on this record.

> [T]he decision whether to provide additional treatment is a classic example of a matter for <u>medical judgment</u>. A showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, <u>intentionally</u> treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Deliberate indifference is an extremely high standard to meet.

<u>Gobert</u>, 463 F.3d at 346 (footnotes, citations and internal quotations omitted) (emphasis added). No such showing has been made on the current record. The decisions made by the treating medical providers to render the care that they gave and the provision of surgery after Addison's physicians at LSU Hospital and Rayburn were satisfied, based on objective testing, that surgery was the appropriate treatment are classic examples of the exercise of "medical judgment." Even if incorrect, such judgments cannot serve as the basis for a finding of deliberate indifference in the constitutional sense.

Mere delay in receiving care is not in and of itself a constitutional violation. <u>Easter v. Powell</u>, 467 F.3d 459, 463 (5th Cir. 2006); <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 195 (5th Cir. 1993); <u>Wesson v. Oglesby</u>, 910 F.2d 278, 284 (5th Cir. 1990). Regardless of the length of delay, plaintiff at a minimum must show deliberate indifference to serious medical needs. <u>Wilson</u>, 501 U.S. at 298. No such showing can be made in this case in light of the continuing medical attention Addison received for his back condition.

Contrary to plaintiff's entirely speculative and conclusory allegations, the competent summary judgment <u>evidence</u> is clear and uncontroverted that the delay in scheduling his surgery was due to the medical decisions and scheduling protocols of the LSU Hospital system, including its surgery board that must approve all surgeries. There is no evidence that any "treatment board" exists at Rayburn. The medical records and the affidavits of Dr. McVea, Nurse Carter (Defendant's Exh. 3, Record Doc. No. 61-5) and Nurse Lesley Temples (Defendant's Exh. 4, Record Doc. No. 61-6) establish that Addison was first seen by the LSU neurosurgery clinic on March 19, 2012, shortly after he arrived at Rayburn. Thereafter, Dr. McVea continually adopted the recommendations of the LSU neurosurgeons. The Rayburn nursing staff followed Dr. McVea's orders and requested all recommended tests, appointments and surgery. The surgery was approved by the LSU surgery board on September 19, 2012, but it was not scheduled until November 20, 2013. With the exception of a one-month delay from March 13 to April 23, 2013, in requesting a follow-up appointment due to a turnover in Rayburn's medical scheduling staff, all of the delays were caused by the doctors at LSU, who ordered repeated tests and examinations at the neurosurgery clinic. There is no evidence that any of the delays were intentional or that any defendant or other employee involved in the scheduling was deliberately indifferent to Addison's serious medical needs.

"[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not." <u>Stewart v. Murphy,</u>

174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious medical condition that ultimately resulted in death does <u>not</u> constitute deliberate indifference, even if treatment was negligently administered); <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 193 (5th Cir. 1993) (prisoner's disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); <u>Varnado v. Lynaugh</u>, 920 F.2d 320, 321 (5th Cir. 1991) (plaintiff, who was 18 months post-surgical implantation of hip prosthesis, who complained of pain in his hip and who was ultimately diagnosed with broken wires in the prosthesis, failed to state a claim for deliberate indifference when he was seen by medical personnel "numerous times for problems relating to his hip.").

The recent decision of the Fifth Circuit in <u>Thomas</u>, which arose originally in this court, presents factual circumstances that support defendants' position.  Like Addison, plaintiff Thomas was incarcerated at Rayburn and was routinely seen by health care providers, including specialists, for his degenerative hip condition.  He received x-rays and an MRI of his hips, pain medication, a bottom bunk bed, a walker and then a wheelchair, and other accommodations for his hip condition, including but not limited to restricted work duty status, and a recommendation for hip surgery, which had not yet been scheduled at the time of the opinion because the prison was still awaiting an orthopedic consultation appointment from LSU Hospital.  <u>Thomas</u>, 593 F. App'x at 340-41.  Like Addison, Thomas complained that a delay by Dr. McVea in referring him for follow-up appointments and a delay by Nurse Carter in scheduling the appointments

amounted to deliberate indifference. The Fifth Circuit held that plaintiff failed to

demonstrate deliberate indifference by either defendant.

> To demonstrate that Nurse Carter was deliberately indifferent when she
> failed to schedule a follow-up appointment, Thomas must present evidence
> that Nurse Carter intentionally refused to treat Thomas or ignored his
> complaints. While the intentional failure to schedule an appointment with
> a medical specialist may amount to deliberate indifference when it causes
> substantial harm, the <u>negligent failure to schedule an appointment does</u>
> <u>not</u>. . . . Thomas does not provide any evidence that Nurse Carter
> intentionally failed to schedule an appointment or even that any delay in
> receiving an appointment was due to Nurse Carter's actions. Given that the
> only evidence in the record suggests an off-site consultation was requested
> on his behalf, Thomas's conclusory allegations are insufficient to raise a
> dispute of fact as to whether Nurse Carter acted with "wanton disregard"
> for his medical needs.

<u>Id.</u> at 343-44 (citing <u>Carrothers v. Kelly</u>, 312 F. App'x 600, 602-03 (5th Cir. 2009);

<u>Gobert</u>, 463 F.3d at 348 n.27; <u>Stewart v. Murphy</u>, 174 F.3d 530, 534 (5th Cir. 1999);

<u>Green v. McKaskle</u>, 788 F.2d 1116, 1127 (5th Cir. 1986)) (emphasis added). Thus, even

if the one-month delay by Rayburn's nursing staff in requesting an appointment in the

instant case was the result of negligence, there is no evidence that it was intentional or

amounted to the level of deliberate indifference.

> Similarly, as to Dr. McVea, the Fifth Circuit held in <u>Thomas</u> that

> "[a] showing of deliberate indifference requires the prisoner to submit
> evidence that prison officials refused to treat him, ignored his complaints,
> intentionally treated him incorrectly, or engaged in any similar conduct that
> would clearly evince a wanton disregard for any serious medical needs."
> Evidence of Dr. McVea's treatment of Thomas demonstrates the contrary.
> He asked Thomas if he required a wheelchair, left a note reminding himself
> to schedule a referral for Thomas, and did in fact refer Thomas, albeit a

> month later.  Even assuming this conduct violated a standard of care, mere
> negligence is insufficient to sustain to a deliberate indifference claim. . . .
> ("[D]eliberate indifference exists wholly independent of an optimal
> standard of care."). . . .  Accordingly, Thomas has not demonstrated that Dr.
> McVea "purposefully neglected [his] medical needs."

Id. at 345 (quoting Gobert, 463 F.3d at 346, 349).  The instant case is the same:  there is

no evidence to suggest that any defendant or Rayburn employee deliberately acted to

delay Addison's surgery, intentionally treated him incorrectly or ignored his serious

medical needs.

Under these circumstances, no finding of deliberate indifference under the

constitutional standard can be made, no violation of clearly established constitutional

rights can be established and defendants' conduct has been objectively reasonable.  For

all of these reasons, the doctrine of qualified immunity compels dismissal of this case as

a matter of law, and defendants' motion for summary judgment should be granted.

(C)     Sovereign Immunity

Addison's complaint seeks "an injunction 'requiring the named defendants [to]

provide the necessary medical care to correct the diagnosed condition,' including

any injury caused by delay in undergoing surgery, as well as 'any physical therapy,

medications, and follow up care ordered by an expert in the pertinent field of

medicine.[']"  Order and Reasons, Record Doc. No. 43, at pp. 2-3 (quoting Complaint,

Record Doc. No. 1 at p. 36).  In his Motion for Institutional Transfer, Record Doc.

No. 52, and his memorandum in opposition to defendants' summary judgment motion,

-30-

Addison alleges that he has not received post-operative physical therapy and that Dr. McVea has refused to authorize any further treatment, even though plaintiff has been diagnosed with damage to his thoracic spine and nerve damage.

Defendants argue that plaintiff's claims under Section 1983 for injunctive relief regarding his medical treatment are barred by the Eleventh Amendment to the United States Constitution, which preserves the sovereign immunity of the States.  While the State of Louisiana generally has not waived its sovereign immunity from Section 1983 lawsuits, the Eleventh Amendment, as interpreted by Ex parte Young, 209 U.S. 123 (1908), and its progeny, "permits suits for prospective injunctive relief against state officials who are acting in violation of federal law." Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004) (citing Ex parte Young, 209 U.S. at 123).  Defendants argue that the Ex parte Young exception does not apply and sovereign immunity bars Addison's claims for injunctive relief because his requests to be seen by a specialist for thoracic nerve damage and to be provided with physical therapy are unsupported by any medical evidence that he needs such care and because he is receiving medical care for his ongoing complaints.

Applying the standards above, defendants' motion to dismiss should be granted. Section 1983 claims against Secretary LeBlanc and the other defendants in their official capacities are barred by the Eleventh Amendment to the United States Constitution.  A state actor sued in his or her official capacity is not considered a person for purposes of

suit under Section 1983. <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58 (1989). Instead, the action would be considered one against the employer, in this case, the State of Louisiana through the Department of Corrections. <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 n.55 (1978).

The DOC itself is a department within the Louisiana state government. La. Rev. Stat. Ann. § 36:401. For Eleventh Amendment purposes, the DOC is considered an arm of the state because any judgment against it or its subdivisions necessarily would be paid from state funds. <u>Anderson v. Phelps</u>, 655 F. Supp. 560, 564 (M.D. La. 1985). Therefore, suit against the DOC, LeBlanc and the other defendants in their official capacities is a suit against the State of Louisiana, which is prohibited by the Eleventh Amendment. <u>Citrano v. Allen Corr. Ctr.</u>, 891 F. Supp. 312, 320 (W.D. La. 1995) ("A suit against any state correctional center would be suit against the state and therefore barred by the Eleventh Amendment.") (citing <u>Anderson</u>, 655 F. Supp. at 560; <u>Bldg. Eng'r Serv. Co. v. Louisiana</u>, 459 F. Supp. 180 (E.D. La. 1978)).

The State of Louisiana is immune from suit in federal court under the Eleventh Amendment. Sovereign immunity under the Eleventh Amendment bars actions for monetary relief in federal court against a State or state agency unless the State has consented to be sued. U.S. Const. amend. XI; <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 100 (1984); <u>Alabama v. Pugh</u>, 438 U.S. 781, 782 (1978); <u>Richardson v. S. Univ.</u>, 118 F.3d 450, 452 (5th Cir. 1997).

Generally, the State of Louisiana has not waived its immunity or consented to the exercise of federal judicial power in civil actions against it.  La. Rev. Stat. Ann. § 13:5106(A);  Delahoussaye v. City of New Iberia, 937 F.2d 144, 147 (5th Cir. 1991). Thus, in each unsanctioned instance of federal suit, the State or its agency must affirmatively waive its Eleventh Amendment immunity.  Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 305 (1990); Stem v. Ahearn, 908 F.2d 1, 4 (5th Cir. 1990).  The DOC has not done so in this case.

"To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law."  Frew ex rel. Frew, 540 U.S. at 437 (citing Ex parte Young, 209 U.S. 123 (1908)).  This standard allows federal courts to order prospective relief and ancillary relief thereto when a violation of federal law exists.  Id. (citing Edelman v. Jordan, 415 U.S. 651 (1974); Milliken v. Bradley, 433 U.S. 267 (1977); Green v. Mansour, 474 U.S. 64, 71-73 (1985)).

"In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  Verizon Md., Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 645 (2002) (quotation omitted).

Addison has failed to allege any ongoing violation of federal law.  His request for surgery to correct his diagnosed lumbar condition is moot, since he had the surgery on November 20, 2013.  His request for an injunction to correct any injury caused by delay in undergoing surgery is similarly moot, as there is no medical evidence that he suffered any injury that needs to be corrected as a result of the delay.  As to his allegations of ongoing thoracic nerve damage and constitutionally inadequate post-operative care, these allegations are negated by the evidence.

Dr. McVea adopted all the post-operative recommendations of plaintiff's neurosurgeons, including ordering additional MRIs, with the exception that Dr. McVea changed some of the recommended pain medications to others, based on the readier availability of certain medications at Rayburn, on Dr. McVea's professional opinion that Addison did not need narcotic pain medication and on plaintiff's own decision to forego Neurontin.  On May 19, 2014, Dr. Culicchia released plaintiff from further neurosurgical care and specifically stated that Addison has no surgical lesion in the thoracic spine.  No specialist ever recommended physical therapy.  Addison was taken to all follow-up appointments at LSU ordered by his treating health care providers.  He was released by the LSU clinic to begin light duty on January 1, 2014, followed by a return to full duty after three months, and he returned to light duty as a baker.  Defendant's Exh. 1, Record Doc. No. 61-3 at ¶¶ 207-10, 215-16, 225; Defendant's Exh. 2, Record Doc. No. 61-4 at p. 0458; Defendant's Exh. 7, Record Doc. No. 61-9 at p. 3.  Dr. McVea continued to treat

plaintiff after his surgery, including examining him, prescribing medications (only some of which plaintiff chose to take) and prescribing softer shoes when Addison complained that "hard footwear" was causing him back pain.  Decisions about how to treat a diagnosed condition, including which medications to prescribe, are "classic example[s] of a matter for medical judgment."  Gobert, 463 F.3d at 346; see also id. at 349 n.32 ("Considering and failing to follow the recommendations of another treating physician does not amount to deliberate indifference.") (citation omitted).

Accordingly, there is no evidence that the defendants "are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so."  Farmer, 511 U.S. at 845-46.  In the absence of evidence of any ongoing violation of plaintiff's constitutional rights, the Ex parte Young exception does not apply and sovereign immunity bars Addison's claims for injunctive relief.

## **RECOMMENDATION**

For all of the foregoing reasons, **IT IS RECOMMENDED** that defendants' motion for summary judgment, Record Doc. No. 61, be **GRANTED** and that plaintiff's complaint be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of

plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[11]

New Orleans, Louisiana, this ___30th___ day of March 2015.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[11]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

-36-